UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                          Chapter 11

Cheerview Enterprises, Inc.,                    Case No. 17-56162

        Debtor.                                 Hon. Phillip J. Shefferly
_____/

## OPINION (1) GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT; (2) DENYING CONFIRMATION OF PLAN OF REORGANIZATION; AND (3) GRANTING MOTION FOR RELIEF FROM THE AUTOMATIC STAY

### INTRODUCTION

The debtor in this Chapter 11 case owns a gas station and convenience store. The debtor seeks final approval of its disclosure statement and confirmation of its plan of reorganization. Two objections were filed: one by the debtor's largest secured creditor, and another by a large unsecured creditor. The secured creditor also filed a motion for relief from the automatic stay. For the reasons set forth in this opinion, the Court will grant final approval of the disclosure statement, deny confirmation of the plan of reorganization, and grant the motion for relief from the automatic stay.

The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and (b). These are core proceedings under 28 U.S.C. § 157(b)(2)(G) and (L).

## PROCEDURAL HISTORY

On November 21, 2017, Cheerview Enterprises, Inc. ("Cheerview") filed this Chapter 11 bankruptcy case. On January 12, 2018, a secured creditor, Stockbridge Acquisitions, LLC ("Stockbridge") filed a motion for relief from the automatic stay ("Motion for Stay Relief"). On January 26, 2018, U.S. Venture, Inc., d/b/a U.S. Oil ("U.S. Oil"), claiming that it too is a secured creditor, filed a concurrence and joinder in the Motion for Stay Relief. Cheerview filed a response to the Motion for Stay Relief.

On February 19, 2018, Cheerview filed a combined disclosure statement and plan of reorganization. Two days later, Cheerview filed a first amended combined disclosure statement and plan of reorganization. Consistent with its ordinary practice, and with the Chapter 11 case management order that it entered earlier in this case, the Court granted preliminary approval of the first amended disclosure statement, set deadlines for voting and for objections, and scheduled a hearing regarding final approval of the first amended disclosure statement and confirmation of the first

amended plan of reorganization. Stockbridge and U.S. Oil each objected, both to the adequacy of the information in the first amended disclosure statement and to confirmation of the first amended plan of reorganization. In addition, Stockbridge and U.S. Oil each filed an election under § 1111(b) of the Bankruptcy Code to have their respective claims treated entirely as allowed secured claims. On April 19, 2018, Cheerview filed a summary of the ballots and the status of the objections to its first amended disclosure statement and plan of reorganization.

On April 20, 2018, the Court held a hearing on Cheerview's request for final approval of the first amended disclosure statement and confirmation of the first amended plan. At the same time, the Court also held a hearing on the Motion for Stay Relief. Just prior to the hearing, Cheerview filed a second amended combined disclosure statement and plan of reorganization. After listening to arguments by lawyers for Cheerview, Stockbridge and U.S. Oil, the Court found that there are disputed issues of material fact that require the Court to hold an evidentiary hearing. Cheerview also informed the Court that it intended to file a third amended combined disclosure statement and plan of reorganization. The Court adjourned the hearings and set some deadlines, both for the filing of Cheerview's third amended combined disclosure statement and plan of reorganization, and for any supplements to the objections filed by Stockbridge and U.S. Oil.

On May 1, 2018, Cheerview filed a third amended combined disclosure statement and plan of reorganization ("Third Amended Disclosure Statement and Plan"). Stockbridge and U.S. Oil filed supplements to their objections.

The Court held an evidentiary hearing over two days, May 30, 2018 and June 1, 2018. Cheerview called four witnesses: Mohamad Berro, Hassan Ouza, Fadi Elghoul, and Michael Zerka. The Court admitted into evidence Cheerview's exhibits 1 through 15, and 18. Stockbridge called Kassem Beydoun as its only witness. The Court admitted into evidence Stockbridge's exhibits A and B. U.S. Oil did not call any witnesses or offer any exhibits of its own, but participated in the evidentiary hearing. On June 4, 2018, the Court heard closing arguments and permitted the parties to file post-trial briefs. Following receipt of the post-trial briefs, the Court took the matters under advisement. This opinion constitutes the Court's findings of fact and conclusions of law with respect to the Third Amended Disclosure Statement and Plan and the Motion for Stay Relief.

<u>FACTS</u>

Based on the evidence adduced at the evidentiary hearing, and from its review of the entire case file, the Court finds the following facts.

Cheerview is a Michigan corporation that owns a gas station and convenience store located at 700 South Waverly, at the corner of St. Joseph, in a busy traffic area

in Lansing, Michigan ("Property"). In early 2015, Mohamad Berro ("Berro"), then a 26-year old individual who owned an oil change business, learned that the stock in Cheerview was for sale. Ali Damsaz ("Damsaz"), a shareholder in Cheerview, told Berro this was a good location and that Berro could basically run the business from his home if he kept the same employees. Berro purchased the stock sometime in 2015 and became the sole owner of Cheerview.

At the time of the purchase, SSB Bank held a first mortgage on the Property to secure two promissory notes made by Cheerview. In addition, Cheerview was party to a petroleum supply agreement with U.S. Oil pursuant to which U.S. Oil sold Exxon Mobil Oil petroleum products to Cheerview to sell at the Property. U.S. Oil also held a mortgage on the Property to secure payment by Cheerview for the products that it purchased under the petroleum supply agreement. The record does not show how much was owed by Cheerview either to SSB Bank or to U.S. Oil when Berro purchased Cheerview, but there is no dispute by any party that SSB Bank and U.S. Oil had agreed between themselves that U.S. Oil's mortgage was subordinate to SSB Bank's mortgage up to $360,000.00.[1]

---

[1] A Real Estate Mortgage Subordination Agreement dated January 29, 2016 is attached to a pleading filed by U.S. Oil on January 26, 2018 (ECF No. 47), although it was not made part of the evidentiary record.

-5-

When Berro purchased the stock in Cheerview, he planned to have Cheerview continue to make the payments on the SSB Bank mortgage and continue to purchase gas from U.S. Oil under the petroleum supply agreement. Although Cheerview would continue to own the Property after Berro purchased Cheerview, Berro formed a new corporation known as Mikey's Fuel Mart, Inc. ("Mikey's") to operate the gas station and convenience store.

Berro was an absentee owner. After acquiring Cheerview, he continued to work full time in his oil change business and only went out to the Property about once a month. He also took Damsaz's advice and kept the existing Cheerview employees to run the business. That turned out to be a big mistake. At least one of those employees, and maybe more, were stealing from the business. It took awhile for Berro to discover the theft. Once he did, he fired the employees and filed a police report.

Sometime in 2016, Mikey's hired Hassan Ouza ("Ouza"), a long time personal friend of Berro, to help him deal with Cheerview's problems. Although only in his early 30's, Ouza had managed and otherwise worked in gas stations for over 15 years. However, Berro and Ouza were unable to turn Cheerview's business around.

U.S. Oil's records (exhibit 14) show that the gas station at the Property sold approximately 35,000 gallons of gas per month during 2016. The largest sales month

was March, 2016, with 51,392 gallons sold. The 2016 federal income tax return for Mikey's (exhibit 11) shows that Mikey's lost $75,428.00 on gross receipts of $1,056,341.00 in 2016. Losing money and unable to make its payments to SSB Bank, U.S. Oil and its other creditors, Mikey's shut down the operation of both the gas station and the convenience store in August, 2017. The Property has been shuttered since that date.

Although the precise date is not clear from the record, both SSB Bank and U.S. Oil began foreclosure proceedings on their respective mortgages in mid-2017. Also not clear from the record is exactly how much Cheerview owed on the SSB Bank and U.S. Oil mortgages at that time. However, Berro does not dispute that the balance owed on the two mortgages at that time was greater than the value of the Property. Cheerview's schedules (exhibit 5) list the SSB Bank debt as $403,000.00 and the U.S. Oil debt as $42,000.00 when Cheerview filed its bankruptcy petition in November, 2017. Cheerview's schedules list the value of the Property at the time of the bankruptcy petition as $200,000.00. At the trial, Berro testified that he now estimates the value of the Property and its contents to be $250,000.00. That is roughly consistent with the value of the Property assessed by the Eaton County Treasurer (exhibit 10). Neither Stockbridge nor U.S. Oil dispute this estimate. Based on Berro's testimony, the tax assessment, and the absence of any dispute by Stockbridge

-7-

and U.S. Oil, the Court finds that the value of the Property on the date of the bankruptcy petition was $250,000.00.

Despite the failure of the business, and even though the value of the Property is far less than the mortgages on it, the Property is still considered by others in the gas station industry to be a good location for a gas station and convenience store.

Safeway Oil Company ("Safeway") owns, operates and supplies petroleum products to more than 50 gas stations and convenience stores in the metropolitan Detroit area. Beydoun is the president of Safeway. Beydoun is also the managing member of Stockbridge. Sometime in September, 2017, Beydoun learned through a broker about the pending foreclosure of the SSB Bank mortgage on the Property. Beydoun arranged to have Stockbridge purchase the SSB Bank mortgage so that he could acquire the Property for a Safeway gas station. On October 3, 2017, SSB Bank sold Stockbridge all of its rights in and to the Cheerview mortgage debt on the Property. Stockbridge continued the foreclosure proceedings that SSB Bank had started on the Property.

As the foreclosure proceedings brought by Stockbridge and U.S. Oil came to a head, Cheerview filed its Chapter 11 petition. However, just before it filed the petition and even though Cheerview had no income – since both the gas station and convenience store remained closed – Cheerview decided to have some work done on

the Property by Fadi's Heating and Cooling ("Fadi's"), a contractor located in Dearborn Heights, Michigan, owned by Fadi Elghoul ("Elghoul"), a distant relative and friend of Ouza's family.

On November 6, 2017, Ouza and Berro contacted Elghoul and requested that Fadi's install an ice machine, repair the compressor, and do some other work on the Property. They told Elghoul that they could not pay for the work at that time, but that they would be able to pay for it in a couple of weeks when they expected to reopen the gas station and convenience store. They also told him that payment would be secured and, if they failed to pay, Fadi's could pick up the equipment that it installed.

Even though the Property is located in Lansing, outside the geographic region where Fadi's ordinarily works, and even though Ouza and Berro said they could not pay for the work they were requesting, Elghoul agreed to have Fadi's do the work because Elghoul had done work for Ouza's family members for over 20 years, including work on some very large projects, and has a long time friendship with the family. Elghoul did not hire a lawyer to represent Fadi's in this transaction because Ouza and Berro told him that they would handle all the paperwork for him.

On November 7, 2017, Elghoul sent two Fadi's employees out to the Property to do the work. When the work was done, Elghoul gave Cheerview a Fadi's invoice (exhibit 3), dated November 7, 2017, for $8,360.00. Berro and Ouza gave Elghoul a

security agreement (exhibit 4) signed by Berro on behalf of Cheerview that grants Fadi's a security interest in the ice machine, compressor, and other parts. This was not something that Elghoul was familiar with, and not something Fadi's had previously used in its business. Nor was it something that Berro and Ouza had ever done. However, again because of his long standing relationship with the Ouza family, Elghoul agreed that Fadi's would accept the security agreement to secure Cheerview's payment to Fadi's.

Cheerview did not pay the Fadi's invoice. But Cheerview's attorney took some action to protect Fadi's. On the same morning that Cheerview filed its Chapter 11 petition, Cheerview's attorney filed a UCC-1 financing statement (exhibit 2) that he had prepared describing the ice machine, compressor, and other parts that served as collateral for Cheerview's debt owed to Fadi's. Neither Berro, Ouza nor Elghoul had ever seen the UCC-1 financing statement before it was filed, nor did any of them know that it was being filed by Cheerview's attorney on the morning of the Chapter 11 filing. Fadi's is still owed $8,360.00 for the work that it did on the Property.

Since the filing of this Chapter 11 case, Cheerview has not transacted any business. But the Third Amended Disclosure Statement and Plan states that Cheerview intends to now reopen the gas station and convenience store. Toward that end,

Cheerview has entered into two specific transactions, subject to Court approval, that Cheerview believes will enable it to reopen the business and become profitable going forward.

First, on November 1, 2017, Cheerview entered a Business Property Lease ("Waverly Lease") (exhibit 7) with Waverly Food Service, Inc. ("Waverly"). Waverly is a corporation newly formed by Ouza for the purpose of operating the gas station and convenience store at the Property. Ouza is the president and sole owner of Waverly. The Waverly Lease is a three year lease with multiple options to extend. It provides for monthly rent of $1,700.00. Although the Waverly Lease states that it is effective November 1, 2017, Waverly has not yet taken possession of the Property, paid any rent, or operated any business either at the Property or elsewhere.

Second, on April 13, 2018, Cheerview entered into a series of agreements ("RPF Agreements") (exhibit 18) with RPF Oil Company ("RPF"), a gas supplier for approximately 85 gas stations, that primarily sells BP products. Under Cheerview's prior agreement with U.S. Oil, Cheerview purchased gas from U.S. Oil and then Cheerview set its own price to sell the gas at the Property. In contrast, under the RPF Agreements, Cheerview will not purchase any gas, but instead RPF will provide gas to Cheerview and then pay Cheerview a 4% commission on any gas that Cheerview sells. Under this arrangement, RPF will determine the price at which Cheerview sells

-11-

the gas and RPF will also maintain the pumps and control all aspects of the sale of gas by Cheerview. The RPF Agreements require Cheerview to sell a minimum of 70,000 gallons per month, because that is what BP requires, and give RPF the right to terminate the RPF Agreements if the minimum sales are not met. The RPF Agreements contain some inconsistencies within them. However, when read together, they appear to be for a 10 year term that requires Cheerview to sell 8,400,000 gallons, with the first two years tied to the commission arrangement, but with Cheerview having an option to get out of the commission arrangement for the remaining eight years, and convert to an arrangement where Cheerview will purchase gas from RPF and set its own price for the gas that it sells. The RPF Agreements are personally guaranteed by Berro and Ouza.

The Third Amended Disclosure Statement and Plan is accompanied by projections ("Projections") (exhibit 6) of Cheerview's operations for the next 60 months. The Projections are expressly based on the premise that Cheerview will sell 54,000 gallons of gas per month under the RPF Agreements. Except for the 4% commission to be received from RPF for the gas sold by Cheerview, the other line items on the Projections for income and expenses are largely taken from the historical experience of Mikey's, as shown on its financial statement for 2016 (exhibit 11). All of those line items remain constant over the 60 months covered by the Projections.

-12-

The Projections assume that Ouza and Berro will both work full time at the gas station and convenience store and that they will have one part-time employee as well. The Projections assume net revenue more than double the net revenue of Mikey's, and show how that net revenue will be used to pay Cheerview's creditors.

## ISSUES

Cheerview, Stockbridge, and U.S. Oil raise a number of legal issues and Bankruptcy Code sections that the Court must consider regarding: the adequacy of the information disclosed by Cheerview under § 1125; the effect of the § 1111(b) elections by Stockbridge and U.S. Oil; whether Fadi's is an insider under § 101(31); whether Fadi's acceptance of the Third Amended Disclosure Statement and Plan should be designated under § 1126(e); the application of plan confirmation standards under § 1129(a) and (b); and the criteria for automatic stay relief under § 362. The Court will first discuss the adequacy of Cheerview's information, and then turn to plan confirmation issues, including issues relating to the claims and ballots of Stockbridge, U.S. Oil, and Fadi's. The Court will conclude with a discussion regarding automatic stay relief.

## THE DISCLOSURE STATEMENT

Section 1125(b) of the Bankruptcy Code states that acceptance or rejection of a Chapter 11 plan of reorganization may not be solicited unless at the time or before

such solicitation, there is transmitted to the holder of a claim the plan or a summary of the plan, and a written disclosure statement approved by the court as containing adequate information. Section 1125(a)(1) defines adequate information as meaning "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, . . . that would enable [ ] a hypothetical investor of the relevant class to make an informed judgment about the plan[.]" Section 1125(a)(1) further instructs that in determining whether a disclosure statement has adequate information, "the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information[.]"

In the Chapter 11 case management order that the Court entered in this case on January 5, 2018, the Court permitted Cheerview to file a combined disclosure statement and plan of reorganization, and described the procedure to obtain preliminary approval of the disclosure statement, so that the combined disclosure statement and plan of reorganization could be transmitted to parties in interest together. The Court routinely employs this fast-track procedure in smaller Chapter 11 cases as long as there is no objection to such procedure by any party in interest after notice and hearing. The Court adopted this fast-track procedure for smaller cases because it eliminates unnecessary, time consuming and costly litigation concerning the adequacy of the

-14-

disclosure statement. Under this procedure, the Court reviews the combined disclosure statement and plan of reorganization as soon as it is filed. If the Court finds that preliminary approval of the disclosure statement is warranted, the Court enters an order granting preliminary approval of the disclosure statement and setting deadlines for parties in interest to object to final approval of the disclosure statement as well as to vote on and file objections to the plan of reorganization. The Court then hears any objections to final approval of the disclosure statement at the same time that it hears any objections to confirmation of the plan of reorganization. No party in interest objected to using this procedure in this case.

After the Court granted preliminary approval to the Third Amended Disclosure Statement and Plan,[2] Stockbridge and U.S. Oil filed extensive objections. But Stockbridge argues that the Court need not reach any of its or U.S. Oil's objections to the Plan, and need not consider confirmation of the Plan at all, because the Disclosure Statement does not have adequate information to warrant final approval by this Court. Stockbridge objects to the adequacy of the information in the Disclosure Statement for two primary reasons.

---

[2] For convenience sake, even though the Third Amended Disclosure Statement and Plan is filed as one document (ECF No. 95), the Court will hereafter refer separately to the disclosure statement part of the document as the "Disclosure Statement" and to the plan of reorganization part of the document as the "Plan."

-15-

First, the Disclosure Statement fails to provide sufficient information regarding the RPF Agreements. Stockbridge argues that the RPF Agreements are inconsistent with statements in the Disclosure Statement and with Berro's and Ouza's testimony regarding the requirements that the RPF Agreements impose on the amount of gas Cheerview must sell, the payment of the commission by RPF to Cheerview, Cheerview's hours of operations, the marketing to be undertaken by RPF, the terms of a $45,000.00 signing bonus to be paid by RPF to Cheerview, and the remedies available to RPF if Cheerview defaults under the RPF Agreements.

Second, the Disclosure Statement fails to provide sufficient information regarding the Waverly Lease. Stockbridge points out that the Waverly Lease is initially for a term of three years, yet the Plan proposes payments for 20 years. Further, because Waverly is a brand new corporation, Waverly has no history of operations to help evaluate whether it will be capable of performing the terms of the Waverly Lease.

Cheerview did not designate on its Chapter 11 petition that this case is a "small business case" within the meaning of § 101(51C) of the Bankruptcy Code. Instead, it designated this case as a "single asset case." Putting aside for the moment whether this was an accurate designation, this case is not by any measure a large or complex bankruptcy case. Cheerview is a closely held corporation that has just one shareholder. According to Cheerview's schedules (exhibit 5), the total value of its assets is

$210,000.00, consisting entirely of a shuttered gas station and convenience store located on the Property. Cheerview's schedules show total debts of $481,360.00 owed to a handful of creditors. This is neither a large nor complex case.

The Disclosure Statement contains an extended discussion of the RPF Agreements and the Waverly Lease, both of which are attached in their entirety to the Disclosure Statement. The Disclosure Statement also contains an extended discussion of the only two principals of Cheerview and Waverly, Berro and Ouza, and includes the 2016 financial statement and tax return for Mikey's, the entity that operated the gas station and convenience store during 2016, the only full year of operations after Berro acquired Cheerview. It is true that the Disclosure Statement does not say much about Waverly, but it does not seem that there is much to tell since Waverly is a brand new corporation with no prior experience or operations to discuss.

Fairly read, the substance of Stockbridge's objection goes not to the adequacy of the information regarding the RPF Agreements and Waverly Lease, but instead to Stockbridge's contention that the Plan, which is predicated on the RPF Agreements and Waverly Lease, is just not a feasible plan of reorganization. That is a plan confirmation objection, not a disclosure statement objection.

It is also worth noting that the only party complaining about the adequacy of Cheerview's information is Stockbridge. Stockbridge bought the SSB Bank mortgage

-17-

debt after the gas station and convenience store were closed, and less than two months before this Chapter 11 case was filed. By Beydoun's own admission, Stockbridge did not purchase the mortgage debt to collect payment on it, but made the purchase for the express purpose of foreclosing the mortgage to gain ownership of the Property so that Stockbridge can open its own gas station on the Property. Beydoun, the president and owner of Stockbridge, and the person who devised this strategy, has been in the gas station business for nearly three decades, owns or operates over 50 gas stations already, has extensive expertise in this industry, and is very knowledgeable about the past operations and future prospects of business at the Property. What else does he need to know about Cheerview to implement his stated goal to vote no on the Plan? Stockbridge does not identify any benefit that could possibly be gained either by Stockbridge or by any other creditor by insisting on more information in the Disclosure Statement.

The Court rejects Stockbridge's objection to the adequacy of the information contained in the Disclosure Statement. The Court finds that the information contained in the Disclosure Statement is adequate under § 1125(a)(1) to enable a hypothetical investor to make an informed judgment about the Plan, given the size and complexity of this case, the cost of additional information and the absence of any benefit to creditors by requiring additional information.

-18-

## THE PLAN

Section 1129(a) of the Bankruptcy Code states that the Court shall confirm a plan of reorganization only if all 16 of the requirements of that subsection are met. As the proponent of the plan, Cheerview has the burden of proving that all of the requirements for confirmation have been met. In re Waterford Hotel, Inc., 497 B.R. 255, 261 (Bankr. E.D. Mich. 2013). Stockbridge and U.S. Oil argue that a number of these requirements are not met with respect to the Plan. The Court will first address those arguments that relate to the votes that were cast regarding the Plan so that the Court can determine how each class of claims or interests voted on the Plan. The Court will then address the remaining arguments that relate to other plan confirmation requirements.

## Section 1129(a)(8)

Section 1129(a)(8) contains one of the most fundamental requirements for confirmation of a Chapter 11 plan of reorganization: each class of impaired claims must vote to accept the plan. Section 1126(c) states that a class of clams has accepted a plan of reorganization if such plan has been accepted by creditors "that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class," without counting the acceptance by any entity whose acceptance was designated as lacking good faith pursuant to § 1126(e). Federal Rule of Bankruptcy

Procedure 3018(c) prescribes the procedure to accept or reject a plan of reorganization: an acceptance or rejection must be in writing, signed by the claimant, and conform to the Official Form prescribed by the Judicial Conference of the United States. The statute and rule make clear that a claimant's acceptance of a plan of reorganization requires an affirmative act – a written acceptance on the prescribed form. The statute and rule do not authorize the Court to infer a claimant's acceptance just because the claimant did not vote to reject a plan of reorganization.

The Plan has four classes of claims. The Plan states that all four classes of claims are impaired. Class 1 consists of Eaton County Treasurer's secured claim for $24,000.00. Class 2 consists of Stockbridge's secured claim for $403,000.00. Class 3 consists of Fadi's secured claim for $8,360.00. Class 4 consists of unsecured claims totaling $283,500.00.

No ballot was received from the sole claimant in Class 1, Eaton County Treasurer. That makes Class 1 a non-accepting impaired class. The sole claimant in Class 2, Stockbridge, voted to reject. That makes Class 2 a non-accepting impaired class. The sole claimant in Class 3, Fadi's, voted to accept. That makes Class 3 an accepting impaired class.[3]

---

[3] Stockbridge and U.S. Oil have asked the Court to designate Fadi's acceptance as not in good faith under § 1126(e). The Court will address that request later in this opinion.

The voting in Class 4 requires a bit of explanation. According to Cheerview's ballot summary (exhibit 1), two ballots were received from unsecured claims in Class 4: Stockbridge and U.S. Oil, both of which voted to reject. However, because Stockbridge, the holder of the first mortgage on the Property, made an election under § 1111(b)(1)(A), Stockbridge's entire claim is allowed as a secured claim under § 1111(b)(2).[4] In other words, Stockbridge does not hold an unsecured claim and, therefore, its vote to reject the Plan must be counted only in Class 2, and not in Class 4.

In contrast, the ballot filed by U.S. Oil rejecting the Plan is properly counted in Class 4. Like Stockbridge, U.S. Oil, which holds the second mortgage on the Property, made an election under § 1111(b)(1)(A) to have its entire claim allowed as a secured claim. However, § 1111(b)(1)(B) expressly states that an entity may not elect application of § 1111(b)(2) to have its entire claim allowed as a secured claim if the interest of such entity in the property that secures its claim is of inconsequential value. In this case, the uncontroverted evidence establishes the value of the Property at

---

[4] Ordinarily, under § 506(a)(1) of the Bankruptcy Code, a claim that is secured by property of the estate is allowed as a secured claim to the extent of the value of the estate's interest in such property, and is allowed as an unsecured claim for the amount of the claim that exceeds the value of the estate's interest in such property. The effect of § 506(a)(1) on a claim that is partially secured is to bifurcate the claim into an allowed secured claim and an allowed unsecured claim. In Chapter 11, subject to two exceptions, § 1111(b)(1)(A) gives the holder of a partially secured claim an option to elect to have its entire claim allowed as a secured claim under § 1111(b)(2) rather than have it bifurcated under § 506(a)(1). In this case, Stockbridge elected under § 1111(b)(1)(A) to have its entire $403,000.00 claim allowed as a secured claim under § 1111(b)(2) and forego any allowed unsecured claim.

-21-

$250,000.00. The Plan states – and no party disputes – that Stockbridge is owed $403,000.00 on its claim, its claim is secured by a mortgage on the Property, and its mortgage has priority over U.S. Oil's mortgage up to $360,000.00. Because the balance (i.e., $360,000.00) owing on Stockbridge's mortgage that has priority over U.S. Oil's mortgage far exceeds the value (i.e., $250,000.00) of the estate's interest in the Property, there is no equity in the Property to support U.S. Oil's mortgage. That means that the interest of U.S. Oil as the holder of a second mortgage on the Property is of inconsequential value. As a result, U.S. Oil is not eligible to elect under § 1111(b)(1)(A) to have its entire claim allowed as a secured claim under § 1111(b)(2). U.S. Oil's ballot rejecting the Plan is therefore properly counted in Cheerview's ballot summary as an unsecured claim in Class 4. That makes Class 4 a non-accepting impaired class.

To recap, for purposes of § 1129(a)(8), there are three non-accepting impaired classes of claims: Class 1, Class 2, and Class 4. The Court finds that the Plan does not meet the requirement of § 1129(a)(8).

### Section 1129(a)(10)

Section 1129(a)(10) is another plan confirmation requirement that focuses on the votes that are cast on a plan. It sets a separate requirement for plan confirmation that is independent of the requirement in § 1129(a)(8). Section 1129(a)(10) states that if

the plan impairs a class of claims, then "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by an insider."

The Plan expressly states that it impairs Classes 1 through 4. As explained earlier, Classes 1, 2, and 4 have not accepted the Plan. The only impaired class that has accepted the Plan is Class 3. Ordinarily, because Class 3 is an impaired accepting class, that would be enough for the Court to find that the Plan meets the requirement of § 1129(a)(10). However, Stockbridge and U.S. Oil advance four reasons why Class 3's acceptance of the Plan does not satisfy § 1129(a)(10): first, Fadi's does not hold an allowed claim against Cheerview that it can vote in any class; second, even if Fadi's does hold an allowed claim against Cheerview, the security interest held by Fadi's is a preferential transfer, the avoidance of which means that Fadi's does not hold a secured claim entitled to vote in Class 3, but only an unsecured Class 4 claim; third, even if Fadi's does hold an allowed secured claim in Class 3, the acceptance of the Plan by Class 3 does not count because Fadi's is an insider; and fourth, in any event, under § 1126(e), the Court should designate Fadi's acceptance of the Plan as not in good faith. The Court will address each of these reasons in sequence.

-23-

1.  <u>Does Fadi's hold an allowed claim against Cheerview</u>?

Cheerview's schedule D (exhibit 5) lists Fadi's as the holder of a secured claim in the amount of $8,360.00. Because this claim is not listed as disputed, contingent, or unliquidated, under Fed. R. Bankr. P. 3003(c)(2), Fadi's is not required to file a proof of claim. But Stockbridge and U.S. Oil urge the Court to disregard Fadi's claim because it was entirely contrived by Cheerview on the eve of the bankruptcy case to manufacture a friendly class of claims to vote in favor of the Plan. They point out that when Ouza and Berro contacted Elghoul on November 6, 2017 to have Fadi's do some work on the Property, the gas station and convenience store had been shut down for three months and Cheerview was already planning a bankruptcy filing. To Stockbridge and U.S. Oil, the timing is suspicious: without having any business operations at all, Cheerview chose that particular time to focus on installing an ice machine, which was the major part of the work, at the Property. Stockbridge and U.S. Oil argue that in these circumstances, Fadi's claim should not be allowed against Cheerview. Moreover, because Waverly is responsible for improvements to the Property under the Waverly Lease, if Fadi's does hold a claim at all for payment for this work, it is a claim against Waverly and not Cheerview.

It does seem odd that Cheerview, although transacting no business, and with the Property shuttered for some time, would decide in early November to have an ice

machine installed just as Cheerview was planning to file Chapter 11. Cheerview's decision to take that particular action, at that particular moment, may well reflect on Cheerview's good faith. But the uncontroverted testimony at trial showed that Fadi's did the work at the Property and is owed $8,360.00 for the work. And there is no evidence in the record to indicate that the debt exceeds the value of the work. Further, despite Stockbridge's and U.S. Oil's contention that it should be Waverly, not Cheerview, that is responsible for payment to Fadi's, Elghoul, Berro and Ouza all testified consistently that it is Cheerview, not Waverly, that agreed to pay for the work and owes the debt to Fadi's.

Even if Stockbridge and U.S. Oil are right – that Cheerview deliberately incurred the Fadi's debt for strategic reasons to help Cheerview in its upcoming Chapter 11 case – that does not alter the fact that the work was done and the invoice was not paid. Nor does it mean that the Court should disregard the Fadi's claim or otherwise find it unenforceable. The Court finds that Fadi's holds an allowed claim for $8,360.00 against Cheerview.

2. Was the grant of a security interest to Fadi's a preferential transfer?

Stockbridge and U.S. Oil next argue that even if Fadi's does hold an allowed claim against Cheerview, the grant of the security interest to Fadi's is avoidable as a preferential transfer under § 547 of the Bankruptcy Code. Specifically, they argue that

-25-

because Fadi's did not perfect its security interest when it was granted, and only perfected it later on November 21, 2017, the transfer is avoidable because it was made on account of an antecedent debt. If the transfer is avoided, then Fadi's will hold only an unsecured claim entitled to vote in Class 4, and not a secured claim entitled to vote in Class 3.

Cheerview responds that there is no avoidable preferential transfer because Fadi's security interest was perfected when the UCC-1 financing statement was filed within 30 days after Cheerview took possession of the ice machine and other parts supplied by Fadi's.

Cheerview is correct. Under the security agreement, Cheerview granted Fadi's a purchase money security interest in the equipment Fadi's installed at the Property. Assuming that all the elements of a preferential transfer under § 547(b) are met, § 547(c)(3)(B) provides that a trustee may not avoid a transfer "that creates a security interest in property acquired by the debtor . . . that is perfected on or before 30 days after the debtor receives possession of such property[.]" Stockbridge's and U.S. Oil's argument is based on the assumption that the equipment on which Cheerview granted Fadi's the security interest was delivered to Cheerview before the gas station was shut down in August, 2017, which would place the perfection far outside the 30-day safe harbor provision. The evidence is to the contrary. Cheerview acquired the equipment

-26-

on November 7, 2017, and Fadi's perfected its purchase money security interest in that equipment on November 21, 2017. This was well within the 30-day safe harbor of § 547(c)(3)(B). Whatever other legal consequences may flow from Cheerview's decision to incur a debt to Fadi's and perfect Fadi's security interest moments before filing Chapter 11, the grant of Fadi's security interest is not a preferential transfer that is avoidable by Cheerview. Fadi's claim against Cheerview is a secured claim.

### 3. Is Fadi's an insider?

Stockbridge and U.S. Oil next argue that even if Fadi's does hold a secured claim entitled to vote in Class 3, the Court should find that Fadi's is an insider under § 101(31) of the Bankruptcy Code. If Fadi's is an insider, Fadi's vote to accept the Plan cannot count for purposes of determining whether the Plan complies with § 1129(a)(10).

Section 101 of the Bankruptcy Code is titled "Definitions." Section 101(31) refers to the term "insider," but does not actually define the term. Instead, § 101(31) contains a non-exclusive list of entities that the Bankruptcy Code deems to be insiders. The non-exclusive list under § 101(31) varies, depending upon whether the debtor is an individual, a corporation, or other entity. According to the legislative history that accompanies § 101(31), an insider is one who has a close relationship with a debtor in a bankruptcy case that goes beyond a typical arm's-length debtor/creditor relationship:

Because of his close relationship with the debtor, an insider typically knows more about the debtor's financial affairs than the debtor's other creditors, and is often in a position to influence or control, at least in part, the debtor's actions. An insider is usually the first to know that a debtor is contemplating bankruptcy. Armed with this information and power to control the debtor, the insider may step ahead of other creditors demanding payment and then influence the timing of the debtor's bankruptcy petition to avoid the ninety-day preference period. By extending the preference liability of insiders to one year, Congress made it more difficult for an insider to manipulate the timing of bankruptcy so as to avoid the effect of the preference section.

Jahn v. Economy Car Leasing, Inc. (In re Henderson), 96 B.R. 820, 825 (Bankr. E.D. Tenn. 1989) (quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 312, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6269). See also Pepper v. Litton, 308 U.S. 295, 311-12 (1939) (finding that a creditor was an insider because he had "dominant influence" over the debtor and "utilized his strategic position for his own preferment" to the detriment of another creditor); Schilling v. Heavrin (In re Triple S Restaurants, Inc.), 422 F.3d 405, 414 (6th Cir. 2005) ("[C]ourts look with suspicion upon transactions between persons occupying confidential relations[.]") (quotation marks and citation omitted).

Bankruptcy courts refer to the non-exclusive list of entities in § 101(31) as statutory insiders. Inclusion in that list reflects a Congressional determination that an entity having the attributes of one of those specific relationships is always an insider

of the debtor because, by virtue of such status alone, that entity is always in a position to influence or control, at least in part, a debtor's conduct.

But even if an entity is not a statutory insider included in the list in § 101(31), the statute permits a court to examine the specific facts surrounding a particular relationship of an entity to the debtor to determine whether that relationship, although not making an entity a statutory insider, is one that calls for closer scrutiny than an arm's-length relationship. If so, a court may still find such entity to be an insider. These relationships are frequently referred to as non-statutory insiders.

Stockbridge and U.S. Oil initially asserted that Elghoul is a relative of either Berro or Ouza of the kind that would automatically make him a statutory insider under § 101(31). After hearing the testimony at trial that Elghoul is a distant relative of Ouza and that his only relation to Berro is that his wife's mother is Ouza's grandfather's sister, Stockbridge and U.S. Oil no longer assert that Elghoul is a statutory insider under § 101(31). But Stockbridge and U.S. Oil do contend that the relationship between Fadi's and Cheerview is sufficiently close that Fadi's should be found to be a non-statutory insider under § 101(31).

The evidence demonstrates that Fadi's is most certainly a friendly creditor. Elghoul has a long-time very friendly relationship with the Ouza family. Because of that friendly relationship, Elghoul allowed his wholly owned company, Fadi's, to do

-29-

work for Cheerview even though the work was in a geographic region beyond the area where Fadi's typically works and, more importantly, even though the work would not be paid for when completed in accordance with Fadi's ordinary business terms. Fadi's did the work for Cheerview without being paid for it, and without Cheerview having any means to pay for it, and instead took a security interest in certain of Cheerview's assets. Elghoul permitted this even though he had never transacted business like this before, was not at all familiar with the paperwork for a transaction of this kind, and depended entirely on Berro and Ouza to handle the paperwork.

The evidence establishes that Elghoul basically did Cheerview a favor by having Fadi's perform work without getting paid and taking a security interest instead of payment. But there is no evidence that Elghoul had more knowledge of Cheerview's financial affairs than Cheerview's other creditors, which allowed Fadi's to gain some influence or control over Cheerview or some other advantage over the other creditors of Cheerview. Nor is there any evidence that Elghoul ever exerted or attempted to exert any control over Berro, Ouza, or Cheerview. Extending credit to Cheerview on the eve of its filing a bankruptcy case did not allow Fadi's to step ahead of other creditors demanding payment from Cheerview. If anything, it exposed Fadi's to a risk of non-payment by an entity whose assets were worth far less than the amount of its debts. Further, there is nothing in the record to suggest that Fadi's manipulated

-30-

Cheerview in any way, as to either the timing of the work that Fadi's did for Cheerview or the timing of the grant of the security interest to secure payment. To the extent that there is any inference to be drawn that one party may have manipulated another party, it is not that Fadi's manipulated Cheerview, but instead is that Cheerview manipulated Fadi's. The Court finds that Fadi's is not an insider under § 101(31).

4. <u>Should the Court designate Fadi's vote under § 1126(e)</u>?

Finally, Stockbridge and U.S. Oil argue that the Court should apply § 1126(e) to designate Fadi's acceptance of the Plan as not being in good faith. Section 1126(e) states that on request of a party in interest, after notice and a hearing, the Court may designate any entity whose acceptance or rejection of a plan was not in good faith, or was not solicited or procured in good faith. "Under this section, the court can disallow the vote of any creditor who acts in bad faith in either voting or soliciting votes for or against a plan." <u>255 Park Plaza Assocs. Ltd. P'ship v. Conn. Gen. Life Ins. Co.</u> (<u>In re 255 Park Plaza Assocs. Ltd. P'ship</u>), 100 F.3d 1214, 1219 (6th Cir. 1996). In discussing a predecessor version of § 1126(e), the Supreme Court explained that the purpose of the good faith requirement in this context is to prevent "obstructive tactics" that give creditors an "unfair advantage" in the confirmation process. <u>Id.</u> (citing <u>Young v. Higbee Co.</u>, 324 U.S. 204, 211 n.10 (1945)). A creditor "'who casts his vote with a purpose of coercing payment to him of more than he might reasonably perceive

as his fair share of the debtor's estate, does not cast his vote in good faith.'"  Id. (quoting Insinger Mach. Co. v. Fed. Support Co. (In re Fed. Support Co.), 859 F.2d 17, 19 (4th Cir. 1988)).  The "'[d]esignation of a creditor's vote is a drastic remedy, and, as a result, designation of votes is the exception, not the rule.  The party seeking to have a ballot disallowed has a heavy burden of proof.'" In re The Heritage Org. L.L.C., 376 B.R. 783, 794 (Bankr. N.D. Tex. 2007) (quoting In re Adelphia Commc'ns Corp., 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006)).

The evidence that Stockbridge and U.S. Oil rely on for purposes of § 1126(e) is the same evidence that they rely on to support their contention that Fadi's is an insider. All of that evidence relates to the circumstances surrounding Cheerview's engagement of Fadi's to do the work on the Property and accept a security interest in lieu of immediate payment.  The only evidence in the record regarding Fadi's ballot accepting the Plan is Elghoul's testimony that he signed the ballot so that he could get paid and so that he could help Cheerview out.  There is no evidence in the record regarding any post-petition communications between Elghoul, on the one hand, and Berro or Ouza, on the other hand, let alone any post-petition communications about the solicitation, procuring, or acceptance of the Plan by Fadi's.  Even the communications that took place pre-petition between Elghoul, Berro, and Ouza are devoid of any reference to how Fadi's claim could somehow help Cheerview in the event of a bankruptcy, or how

-32-

Fadi's vote on a plan may somehow help Cheerview. It is obvious that Fadi's is a friendly creditor of Cheerview. Elghoul – who testified credibly – made no secret of that fact. But by itself, that fact is not sufficient to warrant the Court designating the Plan acceptance by Fadi's as lacking good faith under § 1126(e).

In sum, the Court finds that Fadi's holds an allowed secured claim against Cheerview for $8,360.00, entitled to vote in Class 3. The Court further finds that Fadi's is not an insider, and there are no grounds to designate Fadi's acceptance of the Plan as not in good faith. The objections of Stockbridge and U.S. Oil regarding the acceptance of the Plan by Fadi's are overruled. Fadi's acceptance of the Plan means that Class 3, an impaired class, has accepted the Plan without counting the ballots of any insiders. The Court finds that the Plan meets the requirement of § 1129(a)(10).

### Section 1129(a)(1)

As noted earlier, quite apart from any issues regarding the votes cast with respect to the Plan, Stockbridge and U.S. Oil argue that the Plan does not meet a number of other plan confirmation requirements. The Court will address those arguments based on the numerical sequence of those requirements in the statute.

Section 1129(a)(1) states that the Court shall only confirm a plan if it conforms with the applicable provisions of the Bankruptcy Code. Stockbridge and U.S. Oil each argue that the Plan does not meet this requirement. Stockbridge says the reason it does

not do so is because the Disclosure Statement does not have adequate information under § 1125(a)(1). However, earlier in this opinion, the Court has already ruled otherwise. U.S. Oil cites a different reason why the Plan does not meet § 1129(a)(1). According to U.S. Oil, by placing Fadi's claim in Class 3, the Plan does not comply with § 1122(a) of the Bankruptcy Code, which states that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims of such class. "The manipulation of classes of claims in order to artificially create an accepting class of impaired claims is not permitted." In re Griswold Building, LLC, 420 B.R. 666, 707 (Bankr. E.D. Mich. 2009) (citation omitted). U.S. Oil contends that to the extent that Fadi's holds a claim at all, it should not be in Class 3 as a secured claim, but should instead be in Class 4 claim as an unsecured claim. However, as already explained earlier in this opinion, the Court finds that Fadi's does hold a secured claim. As a result, the Plan's classification of Fadi's claim as a secured claim in Class 3 does not violate § 1122(a).

The Court finds that the Plan complies with the applicable provisions of the Bankruptcy Code and meets the requirement of § 1129(a)(1).

## Section 1129(a)(3)

Section 1129(a)(3) states that the Court shall confirm a plan only if it has been proposed in good faith and not by any means forbidden by law. The Bankruptcy Code

-34-

does not define "good faith." For that reason, courts considering whether a plan has been proposed in good faith do so by examining the totality of circumstances surrounding the plan. In re Griswold Building, 420 B.R. at 708. An objection to a debtor's good faith should not be used as a substitute for "all sorts of more specific objections covered by [other] specific confirmation standards." In re Dow Corning Corp., 244 B.R. 673, 676 (Bankr. E.D. Mich. 1999).

Stockbridge and U.S. Oil base their lack of good faith objection primarily on Cheerview's conduct regarding Fadi's. As explained earlier, they both argue that Fadi's claim was incurred at a time when the gas station and convenience store were shut down and Cheerview had already consulted a bankruptcy attorney. Stockbridge and U.S. Oil contend this was all done to create a secured claim that could be separately classified to supply an impaired class of claims that would accept the Plan.

Three witnesses testified at the trial regarding the Cheerview-Fadi's relationship: Berro, Ouza, and Elghoul. They all readily acknowledge the long standing, friendly relationship that Elghoul had with Ouza's family. But they each deny that they participated in any scheme to create a Fadi's claim against Cheerview for the purpose of manufacturing an impaired class to accept the Plan. They all also deny having any knowledge of the filing of the UCC-1 financing statement by Cheerview's attorney just before Cheerview filed its Chapter 11 petition. And Berro and Ouza testified that the

-35-

reason why they hired Fadi's to do the work at the property just before the bankruptcy petition was filed was because they truly believed that they would soon be able to reopen Cheerview's business at the Property, not to gain some strategic legal advantage in an upcoming Chapter 11 case.

To be sure, Fadi's did a favor for Cheerview by extending credit to pay for the work that Fadi's did. But the work was unquestionably done and the testimony shows that Fadi's had a firm expectation of payment. In retrospect, Fadi's decision to extend credit to Cheerview does not seem prudent. Fadi's did not get paid before the bankruptcy case was filed, and the Plan proposes to pay Fadi's over five years. Nor does it seem prudent for Cheerview to incur the Fadi's debt at that time. Berro's and Ouza's belief that they would soon be reopening the gas station and convenience store may have been sincere, but it was unrealistic. Cheerview did not have the financial wherewithal to reopen the business within the next few weeks after incurring the debt with Fadi's.

Despite the questionable timing of the Fadi's transaction, Elghoul, Berro, and Ouza do not strike the Court as very sophisticated about financial or legal transactions, let alone about the complexities of Chapter 11. Their testimony does not leave the Court with the impression that on their own they orchestrated some scheme to

artificially create an impaired class to vote in favor of a future plan of reorganization in a Chapter 11 case that Cheerview had not yet filed.

Stockbridge and U.S. Oil find it significant that the Fadi's transaction occurred after Cheerview hired a bankruptcy lawyer. It is fair to infer that Cheerview's lawyer knew more than Berro and Ouza did about the Chapter 11 process and plan confirmation requirements. He is an experienced and capable Chapter 11 lawyer. But there is no evidence in the record that he advised Cheerview to incur the Fadi's debt for the purpose of creating an artificially impaired, potentially accepting class. It is true that Berro and Ouza testified that Cheerview's lawyer filed the UCC-1 financing statement. But the UCC-1 financing statement is not what created Fadi's secured claim. Fadi's secured claim was created by Cheerview when Cheerview requested the work on November 6, Fadi's performed the work on November 7, and Cheerview granted a security interest to Fadi's on November 7. There is nothing in the record to show that this transaction was undertaken at the instruction or suggestion of Cheerview's lawyer. The only evidence connecting the Fadi's claim at all with Cheerview's lawyer is Berro's testimony that Cheerview's lawyer drafted the security agreement and UCC-1 financing statement and that he filed the UCC-1 financing statement.

The evidence about the creation of the Fadi's claim does not persuade the Court that the Plan was not proposed in good faith. Nor does the treatment of the Fadi's claim proposed by the Plan. The Plan proposes to pay the Fadi's claim over five years, at the rate of $139.33 per month. This treatment does not pay Fadi's more than its fair share, nor does it give Fadi's some advantage over other creditors holding secured claims.

It is not hard to understand why Stockbridge and U.S. Oil are unhappy that, after all the votes have been cast, Fadi's vote in Class 3 creates the only accepting impaired class of the Plan. Something just does not seem right to them that the only holder of a claim who accepts the Plan happens to be a friendly creditor with a long standing relationship with Ouza's family whose claim against Cheerview did not exist until shortly before Cheerview filed its Chapter 11 petition. But it does not follow from the after-the-fact outcome of the voting – with Fadi's turning out to be the only accepting vote – that the Plan filed by Cheerview must not have been filed in good faith.

The evidence in the record demonstrates that Berro wants to continue to own and operate Cheerview because he believes it can be successful based on the RPF Agreements and the Waverly Lease. Whether the Plan is realistic remains to be seen, but there is no evidence that Cheerview filed the Plan for any improper purpose, or that there was any misconduct by Cheerview regarding the Plan. The Court

overrules the objection by Stockbridge and U.S. Oil that the Plan was not proposed in good faith. The Plan meets the requirement of § 1129(a)(3).

### Section 1129(a)(11)

Stockbridge and U.S. Oil next argue that the Plan does not meet the requirement of § 1129(a)(11) that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan[.]" Section 1129(a)(11) embodies what is commonly understood and referred to as feasibility. The purpose of the feasibility requirement is to protect creditors against unrealistic plans that have little or no chance of success. The debtor has the burden to prove by a preponderance of the evidence that the plan is not likely to fail in order to meet the feasibility test. In re Griswold Building, LLC, 420 B.R. at 697. Feasibility is fundamentally a factual question that depends on the determination of the reasonable probability of payment. A feasibility determination "must be firmly rooted in predictions based on objective fact," showing that "the plan offers a reasonable assurance of success." Id. (citations omitted). "Reasonable assurance of success" requires that the "plan must provide a realistic and workable framework for reorganization," rather than "'visionary promises.'" Id. (quoting In re Made in Detroit Inc., 299 B.R. 170, 176 (Bankr. E.D. Mich. 2003)).

-39-

Stockbridge and U.S. Oil argue that the evidence at trial does not show that the Plan is feasible.

The Plan proposes payments to Class 1 of $533.87 per month; Class 2 of $1,679.17 per month; Class 3 of $139.33 per month; and Class 4 of $472.50 per month. The total monthly Plan payments are $2,804.87.[5] The Plan proposes 60 monthly payments to Classes 1, 3, and 4, and 240 monthly payments on the Stockbridge mortgage that makes up Class 2. The evidence establishes that the Plan depends entirely on the RPF Agreements and the Waverly Lease. The RPF Agreements require that Cheerview sell a minimum of 70,000 gallons of gas per month, and a total of 8,400,000 gallons of gas over the ten year span of the RPF Agreements. Berro and Ouza testified that 70,000 gallons of gas per month is realistic. Their testimony is corroborated by the testimony of Zerka, the Branded Sales Manager for RPF, who is confident that the Property is a very good location for a gas station and, if the gas is priced right, a gas station at the Property can be a "gold mine." The Projections show that there is sufficient money available each month to make all of the Plan payments based on the RPF Agreements and the Waverly Lease.

---

[5] The Plan (exhibit 6) states that the total of the monthly Plan payments is $2,685.54, but that is mistaken. The correct total of the monthly Plan payments is $2,804.87.

Stockbridge and U.S. Oil argue that the Projections are not realistic. The Court agrees. There is no evidence in the record that the gas station at the Property has ever come anywhere close to 70,000 gallons of gas for even one month, let alone every month. As noted earlier, during the time that Mikey's operated the business, it sold an average of approximately 35,000 gallons of gas per month, with the largest month, March, 2016, producing sales of 51,392 gallons of gas. Berro and Ouza brush aside the historical sales volume by Mikey's and say that once reorganized, Cheerview will be able to hit the 70,000 gallons of gas per month marker every month because RPF will be able to set the price for the gas to be sold at the Property and can undercut Speedway, its main competition in the Lansing area. That testimony is persuasively controverted by Beydoun's testimony. Beydoun testified – and even Zerka agreed – that Speedway is the predominant gas station in the Lansing area and that it historically sets the lowest price. The notion that Cheerview will be able to double its historical sales volume immediately following confirmation based on RPF undercutting Speedway's price is not supported by objective fact, but instead appears to be the product of wishful thinking.

Even Cheerview's own Projections do not project that it will sell 70,000 gallons of gas on a monthly basis, but instead project that it will sell only 54,000 gallons of gas on a monthly basis for the entire duration of the Plan. If the Projections are accurate,

that means that when the Plan is confirmed, Cheerview will immediately be in default under the RPF Agreements beginning with the very first month after confirmation and will go into default each and every month for the entire length of the Plan. One of the RPF Agreements, the "Complete Contract of Sale (Branded)," specifies in paragraph 25(b)(xi), that RPF can terminate the RPF Agreements if Cheerview fails to purchase the minimum 70,000 gallons of gas in any month during the life of the RPF Agreements. At the trial, Berro and Ouza seemed only vaguely familiar with this contractual provision, but dismissed it in any event because of their belief that if Cheerview does not hit the 70,000 gallons of gas per month, RPF would simply forego its contractual remedies and agree to extend the life of the RPF Agreements to let Cheerview make up the lost sales. There is nothing in the RPF Agreements that gives Cheerview the option to make up insufficient sales by extending the contract, despite Berro's and Ouza's firm belief to the contrary. The RPF Agreements are clear in stating that RPF can terminate the RPF Agreements if Cheerview misses even one month of 70,000 gallons of gas sold.

The Projections are unrealistic in other respects, too. Berro and Ouza explained that for the line items of income and expenses other than the commission to be paid by RPF, they simply took the historical information from Mikey's and assumed that the line items containing that information will remain constant for the life of the Plan. As

-42-

a result, there are no changes in any of the other line items on the Projections during the life of the Plan, not on the income side, not on the expense side and not even a cost of living increase. Most surprising is that the entire monthly payroll projected for Cheerview is $3,800.00 per month and remains $3,800.00 per month for the entire 60 month length of the Projections. Berro and Ouza testified that they each intend to work full time at Cheerview and that their compensation is included in that payroll. Further, they testified that they intend to hire one more employee. Paragraph 17 of the Complete Contract of Sale (Branded) requires that the gas station be open 24/7 throughout the year except for three holidays. That means that three employees will work for $3,800.00 every month, covering three shifts per day, for at least the next 60 months, and perhaps many more since the Plan proposes to make monthly payments on Stockbridge's Class 2 claim for 240 months – in other words, 20 years. That is not a realistic projection of payroll to run Cheerview's business post-confirmation.

When asked about the inconsistencies both internally in the Projections and when compared to the terms of the RPF Agreements, Berro and Ouza displayed a surprising lack of familiarity. Sometimes they could not answer the questions and explain the inconsistencies, and other times they indicated they needed to talk to their accountant or lawyer. Their lack of familiarity with the information contained in the

Projections, and the assumptions made in those Projections, does not instill much confidence that the Projections are attainable.

Stockbridge and U.S. Oil also question whether Waverly is up to the challenge of meeting its obligations under the Waverly Lease and operating the gas station and convenience store. As noted, Waverly is a brand new corporation with no track record. To the extent that Berro and Ouza have a track record, it is not a good one. Berro readily admits that his absentee ownership contributed to Cheerview's failure that led to the bankruptcy filing. And Ouza was brought on by Berro at Mikey's during 2016, yet he too had no success in turning around the business. Berro and Ouza seem well intentioned and enthusiastic, but their management track record at the Property is poor, particularly when considered in light of the Projections which do not seem to the Court to be attainable even with experienced and capable management.

Finally, it is also worth noting that once Stockbridge made an § 1111(b) election, Cheerview changed the Plan to extend the time to pay the Stockbridge secured claim from 60 months to 240 months.[6] This is important because the Projections cover only

---

[6] Cheerview's strategy in doing so is understandable because § 1129(b)(2)(A) of the Bankruptcy Code provides that a plan of reorganization that is not accepted by a class of secured claims can only be confirmed if the plan provides that each holder of a claim within such class receives deferred cash payments totaling at least the allowed amount of such claim having a value, as of the effective date of the plan, of at least the value of the claimholder's interest in the property that secures the claim. In this case, that means that once Stockbridge made its § 1111(b) election, and then voted to reject the Plan, § 1129(b)(2)(A) requires Cheerview to pay Stockbridge a total of $403,000.00, with a stream of deferred cash payments having a present

the five years needed to make payments to claims in Classes 1, 3, and 4, and do not cover the full 20 years needed to pay Stockbridge. The implication from the Plan is that the Projections, supported by Berro's and Ouza's testimony, show feasibility for the full 20 years of the Plan, not just the first five years. The Court has already noted that the absence of any variables in the Projections's income and expense line items for the five years covered, by itself makes the Projections suspect, because there are no objective facts in the record to indicate that the costs of labor, utilities, suppliers, taxes, repairs, and insurance will remain constant over the next five years. But even if the Court were willing to credit Berro's and Ouza's testimony and accept Cheerview's premise that these income and expense line items will not change during the next five years, there is nothing in the record to support a finding that it is more likely than not that Cheerview will be able to continue to make all of the Plan payments to Stockbridge past the first five years and throughout the entire 20 years of the Plan. Feasibility does not demand that a debtor guarantee that every payment under a plan of reorganization will be made in the future. But there must be some evidence of objective facts to show that all plan payments are likely to be made. Cheerview's conclusory assumption that all income and expense line items for the first five years

---

value of $403,000.00 on the effective date of the Plan. With no proposed balloon payment, the only way for the Plan to make the numbers work to meet these requirements was to have Cheerview extend the payments to Stockbridge under the Plan from five years to 20 years.

-45-

will continue to remain constant for the next 15 years is not enough to show that it is more likely than not that Cheerview will pay $403,000.00 to Stockbridge on a mortgage secured by Property worth only $250,000.00.

After considering all of the evidence, the Court finds that Cheerview did not meet its burden to prove that the Plan is feasible. The plan does not meet the requirement of § 1129(a)(11).

### Section 1129(b)

Cheerview requests that the Court confirm the Plan under § 1129(a). But if the Court cannot do so, Cheerview requests that the Court confirm the Plan under § 1129(b) of the Bankruptcy Code.

Section 1129(b)(1) states that if all of the applicable requirements of § 1129(a) are met, other than § 1129(a)(8), the Court may still confirm a plan, at the request of the plan proponent, if the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims that is impaired under, but has not accepted, the plan. This is frequently referred to as a cram down. Section 1129(b)(2) sets forth requirements for a cram down depending on whether the impaired non-accepting class is a class of secured claims or unsecured claims.

Stockbridge and U.S. Oil object to confirmation under § 1129(b) because, by its express terms, § 1129(b) is only available if all of the requirements under § 1129(a) are

met other than § 1129(a)(8). As explained, the Plan does not meet § 1129(a)(8). It also does not meet § 1129(a)(11) because it is not feasible. For that reason alone, the Court cannot confirm the Plan under § 1129(b).

In addition, there is a second reason why confirmation of the Plan cannot be granted under § 1129(b) even if the Court had found the Plan to be feasible under § 1129(a)(11). In this case, there are three non-accepting impaired classes of claims: secured claims in Classes 1 and 2 and unsecured claims in Class 4. Stockbridge and U.S. Oil argue that, in addition to all of the other reasons why confirmation of the Plan must be denied, the Plan is not fair and equitable with respect to Class 4 unsecured claims, as required for a cram down under § 1129(b)(2)(B). To confirm over an impaired, non-accepting class of unsecured claims, § 1129(b)(2)(B) requires that the plan either provide each holder of a claim within that class with value equal to the allowed amount of their claim, or provide that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." Section 1129(b)(2)(B) embodies the absolute priority rule. In everyday language, it means that if a class of unsecured claims does not accept the plan, the plan must either pay those claims in full, or wipe out any class of claims or interests that is junior to that class.

The Plan does not propose to pay the holders of Class 4 claims property having a value equal to the allowed amount of their claims. Instead the Plan proposes to pay them a distribution of 10% of the allowed amount of their claims over 60 months without interest. That means that the only way the Plan can be crammed down under § 1129(b)(2)(B) is if there is no junior class of claims or interests that will receive or retain any property under the Plan on account of such junior claims or interests. In this case, there is only one class that is junior to Class 4: that is Class 5, which consists of the equity interest held by Berro. The Plan provides that Class 5 will continue to retain ownership of the stock in Cheerview. Anticipating that retention of the Cheerview stock by Class 5 would violate the absolute priority rule if Class 4 voted to reject the Plan, the Plan purports to get around the absolute priority rule of § 1129(b)(2)(B) by providing as follows:

> If any class of Creditors vote to reject the Plan or if the Bankruptcy Court requires, for any reason that New Value be provided to the Debtor, the Interests of the Debtor shall be canceled and new Interests shall be reissued to the Interest Holders upon the investment by the Interest Holders of New Value, or those purchasing the Debtor's equity in the auction contemplated by this Plan.

Under the definitions in the Plan, Berro is the only "Interest Holder." The Plan does not state either the amount or the timing of any "investment" by Berro. As for the auction, the Plan states that it will be held 60 days after confirmation, but before a confirmation order is entered, and only if the Court finds that Berro's investment is

"insufficient." The Plan further provides that the property to be auctioned consists of Berro's equity interest in Cheerview, the opening bid will be $5,000.00 and Cheerview will "hire a broker to market the equity interests and shall publish notice of the auction in the Detroit News or Detroit Free Press."

In Bank of America National Trust & Saving Association v. 203 North LaSalle Street Partnership, 526 U.S. 434, 441-42 (1999), the Supreme Court explained that many lower courts have recognized a "new value" corollary to the absolute priority rule. Under the new value corollary, when a contribution of new value is made in the reorganization process by the holder of an equity interest in a Chapter 11 debtor, such equity holder may be allowed to own the equity in the reorganized debtor post-confirmation. The theory of the new value corollary, and the reason why some courts hold that it does not violate the absolute priority rule, is that when the pre-petition equity holder contributes new value, it is not retaining or receiving an equity interest in the reorganized debtor on account of its pre-petition equity interest – which is junior to unsecured claims – but instead is receiving a new equity interest in the reorganized debtor in exchange for and because of its contribution of new value. For that reason, the new value corollary does not run afoul of the absolute priority rule. The Supreme Court in North LaSalle also noted that those courts that have recognized the new value corollary have required that the new value contribution must be made

-49-

in money or money's worth, in an amount reasonably equivalent to the value of the property received in exchange for the contribution, and must be necessary for the successful reorganization of the restructured enterprise. Further, the opportunity to contribute new value cannot be given exclusively to the pre-petition equity holders under a plan that is adopted without consideration of other alternatives. Id. at 453-57.

Because the Plan is silent as to how much Berro will invest and when he will make that investment, the Court has no trouble finding that Berro's investment is, in the words of the Plan, "insufficient." It is not close to a new value contribution of the kind discussed by the Supreme Court.

As for the auction, there is no evidence in the record to demonstrate that the proceeds of this auction are necessary or essential to the successful reorganization of Cheerview, or to the restructured enterprise. The Plan does not explain how an auction that will not take place until 60 days after confirmation, is necessary to a successful reorganization. Nor is there any evidence to show that the auction proceeds, whether $5,000.00 or some higher amount bid at the auction, are reasonably equivalent in value to the ownership of reorganized Cheerview post-confirmation. There is also no evidence in the record of any advertising or marketing that has been done to attract legitimate potential purchasers to the auction. Instead the Plan states that Cheerview will just begin a marketing process after confirmation, controlled entirely by Berro.

The Plan is silent as to what will become of the personal guaranties by Berro and Ouza of the RPF Agreements if someone other than Berro is the successful bidder at the auction. And it is likewise silent as to whether Berro and Ouza will still agree to work full time for a very modest fixed level of compensation for the next 20 years if Berro is not the successful bidder at the auction. Taken together, these facts strongly suggest that the only bidder at the auction will be Berro, making the auction the functional equivalent of an exclusive opportunity for Berro. The auction proposed by the Plan does not provide a meaningful new value contribution of the type that <u>North LaSalle</u> recognized as permissible under the new value corollary, but is just a contrivance to circumvent the absolute priority rule and permit Berro to continue to own Cheerview. <u>See</u> <u>G & D Inv. Props., LLC</u>, No. 12-61081, 2014 WL 6472842, at *7-8 (Bankr. E.D. Mich. June 5, 2014) (finding a similar plan provision for a new value auction did not meet the "'market exposure and/or competitive process' requirement set forth in <u>North LaSalle</u>").

The Court finds that the Plan cannot be confirmed over the non-acceptance of unsecured Class 4 claims because it violates the absolute priority rule of § 1129(b)(2)(B).

-51-

17-56162-pjs    Doc 116    Filed 07/19/18    Entered 07/19/18 13:32:15    Page 51 of 54

## Motion for Stay Relief

The Motion for Stay Relief is brought under § 362(d)(1) and (2) of the Bankruptcy Code. Section 362(d)(1) provides that on request of a party in interest and after notice and a hearing, the court shall grant relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." Section 362(d)(2) provides that on request of a party in interest and after notice and a hearing, the court shall grant relief from the automatic stay with respect to property of the estate if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." Under § 362(g), in any hearing under § 362(d) concerning relief from the automatic stay, the party requesting such relief has the burden of proof on the debtor's equity in property, and the party opposing such relief has the burden of proof on all other issues.

There are grounds for relief from the automatic stay under both § 362(d)(1) and (d)(2). The Bankruptcy Code does not define cause, as the term is used in § 362(d)(1). Therefore, courts look to the specific facts of each case. See In re Shefa, LLC, 524 B.R. 717, 743 (Bankr. E.D. Mich. 2015). The Motion for Stay Relief argues that cause exists under § 362(d)(1) because Cheerview is not currently operating a business at the Property, leaving it unoccupied and subject to deterioration, which will adversely affect the value of the Property, and Cheerview is not making any adequate protection

-52-

payments to Stockbridge. The Court finds that those facts, in combination with the Court's decision to deny confirmation of the Plan, constitute cause for relief from the automatic stay under § 362(d)(1).

In the alternative, the Court finds that there are grounds to grant the Motion for Stay Relief under § 362(d)(2). Earlier in this opinion, the Court made a finding that the value of the Property is $250,000.00. The Plan concedes that Stockbridge has a mortgage on the Property for $403,000.00, and that U.S. Oil also holds a mortgage on the Property. The evidence demonstrates that there is no equity in the Property for Cheerview. Further, it can no longer be argued that the Property is necessary for an effective reorganization. Being "necessary to an effective reorganization" means that "'there must be a reasonable possibility of a successful reorganization within a reasonable time.'" In re Shefa, 524 B.R. at 744 (quoting United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365, 375-76 (1988)). By this opinion, the Court has now denied confirmation of the Plan. A debtor whose sole asset consists of a shuttered gas station and convenience store on a property worth less than the mortgages on it in a Chapter 11 case that has been pending for eight months, with confirmation of its plan denied, no longer has an effective reorganization in prospect. These facts combine to warrant relief under § 362(d)(2).

-53-

## CONCLUSION

The Disclosure Statement contains adequate information under § 1125(a)(1). However, the Plan cannot be confirmed because it does not meet the requirements of § 1129(a)(8) and (11) and because it violates the absolute priority rule of § 1129(b)(2)(B). There are grounds to grant the Motion for Stay Relief under both § 362(d)(1) and (2). The Court will enter a separate order consistent with this opinion.

**Signed on July 19, 2018**



/s/ **Phillip J. Shefferly**

**Phillip J. Shefferly**
**United States Bankruptcy Judge**

-54-